**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH FLOYD THOMPSON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  CIV-15-1307-SM** |
| | ) | |
| **CAROLYN W. COLVIN, acting** | ) | |
| **Commissioner Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Kenneth Thompson (Plaintiff) brings this action for judicial review of

the Defendant Acting Commissioner of Social Security's (Commissioner) final

decision that he was not "disabled" under the terms of the Social Security

Act.  See 42 U.S.C. §§ 405(g), 423(d)(1)(A).  The parties have consented under

28 U.S.C. § 636(c) to proceed before a United States Magistrate Judge.  Doc.

13.  Following a careful review of the parties' briefs, the administrative

record (AR), and the relevant authority, the court affirms the Commissioner's

decision.

**I.  Disability determination.**

The Social Security Act defines "disability" as the "inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps). Under this sequential procedure, Plaintiff bears the initial burden of proving he has one or more severe impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). If he succeeds, the ALJ will conduct a residual functional capacity (RFC)[1] assessment at step four to determine what Plaintiff can still do despite his impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1048 (10th Cir. 1993). Then, if Plaintiff shows he can no longer engage in prior work activity, the burden of proof shifts to the Commissioner at step five to show Plaintiff retains the capacity to perform a different type of work and that such a specific job exists in the national economy. *See Turner*, 754 F.2d at 328; *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984).

---

[1]     Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

## II.  Administrative proceedings.

After the Social Security Administration (SSA) denied Plaintiff's claims for disability insurance benefits and supplemental security income, he requested and received a hearing before an Administrative Law Judge (ALJ). AR 32-63.  At the hearing, Plaintiff amended his alleged onset of disability date to June 19, 2012.  *Id.* at 37.

The ALJ subsequently found Plaintiff:  (1) was severely impaired by "degenerative disc disease status post cervical fusion, hypertension, status post hiatal hernia, and obesity"; (2) had the RFC to perform a range of light work with only occasional balancing, stooping, kneeling, crouching, crawling, and overhead reaching; (3) could perform his past relevant work as a cross-country truck driver; and (4) was not disabled.  *Id.* at 16-26.[2]  The SSA's Appeals Council found no reason to review the ALJ's decision, which then became the Commissioner's final decision.  *Id.* at 1-6.

## III.  Standard for review.

This Court's review is limited to whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards.  *See Wilson v. Astrue,* 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is 'such relevant evidence as a reasonable mind might

---

[2]      Unless otherwise indicated, quotations are verbatim.

accept as adequate to support a conclusion.'" *Id.* (citation omitted). In determining whether substantial evidence exists, the court "will not reweigh the evidence." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). As the Tenth Circuit has cautioned, "common sense, not technical perfection, is [the court's] guide." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012).

## IV. Claimed error.

Under "Points of Error," Plaintiff lists a single legal error: "[t]he ALJ erred, as a matter of law, by failing to properly evaluate the opinions of [Plaintiff's] treating pain management specialist, Dr. [A.E.] Moorad." Doc. 15, at 7.

## V. Analysis.

### A. Plaintiff's treatment history.

In explaining his assessment of Plaintiff's RFC, the ALJ discussed Plaintiff's relevant treatment history—including Plaintiff's treatment history with Dr. Moorad—in significant detail:

> Prior to the amended alleged onset date, the claimant suffered an injury to his back while at work. The claimant underwent conservative measures including physical therapy, epidural steroid injections, and an anesthetic discogram; however, the claimant continued to complain of pain (Ex. lF/43). Therefore, in July 2009, the claimant underwent an anterior C3-4, C4-5, discectomy with C3-C6 insturmentation, performed by

neurosurgeon, Robert Tibbs, M.D. (Ex. IF/65). By December 2009, Dr. Tibbs released the claimant back to work (Ex. lF/49/51).

Yet, the claimant continued to complain of back and neck pain. Therefore, as part of a Worker's Compensation court order, in February 2011, the claimant began a treating relationship with A.E. Moorad, M.D., from the Southwest Rehabilitation and Occupational Center (Ex. 1F; 5F). Dr. Moorad treated the claimant for chronic pain management maintenance status post C3 through C4 and C5 ACDF fusion (*See generally* ex. 1F). Dr. Moorad saw the claimant every two to three months to supply his medication (Ex. 1F/45).

*Dr. Moorad's treatment notes are consistent over time and support that the claimant is not precluded from all work activity.* At appointments, the claimant complained of residual, radicular, and sciatica pain (Ex. 1F). Upon examination in February, August, and November 2012, Dr. Moorad found the claimant had tenderness in the cervical area and tenderness over the cervical spine with decreased range of motion, limited flexibility, and decreased posture (Ex. 1F/19/24). Moreover, Dr. Moorad found the claimant had tenderness over the paravertebral muscles and spine bilaterally; and decreased flexion, range of motion, and flexibility (Ex. 1F/19/24/28).

However, even with the above findings, at the same appointments the claimant had no muscle spasms, no muscle atrophy, negative straight leg raises, and normal strength in all of his extremities (Ex. 1F/19/24/29). Dr. Moorad also found that the claimant had good motor and muscle with intact sensation (Ex. 1F/19-20/24/28-29). Moreover, *continued appointments with Dr. Moorad revealed that the claimant was able to do more and was more functional with the help of his medications* (Ex. 1F/18/25/28).

Follow-up examination ns with Dr. Moorad in February and May 2013, revealed *similar findings*. In February 2013, the claimant readily admitted he was starting work as a bus driver (Ex. 1F/8). Upon examination, Dr. Moorad found the claimant had tenderness in the cervical area and tenderness over the

5

cervical spine with decreased range of motion, limited flexibility, and decreased posture (Ex. 1F/3/9). Moreover, Dr. Moorad found the claimant had tenderness over the paravertebral muscles and spine bilaterally; and decreased flexion, range of motion, and flexibility (Ex. 1F/3/9). Yet, as previously found, the claimant had no muscle spasms, no muscle atrophy, negative straight leg raises, and normal strength in all of his extremities (Ex. 1F/3/9). Dr. Moorad also found that the claimant had good motor and muscle strength with intact sensation (Ex. 1F/3/9). Based on Dr. Moorad's findings of tenderness and decreased range of motion, the claimant is limited to the above residual functional capacity.

In May 2014, the claimant presented to Anthony Shawnee Hospital with increased neck pain after hearing a loud "pop" (Ex. 3F/l/7). However, the findings from this hospital visit do not support that the claimant is further limited than in the above residual functional capacity. Upon presentation, the claimant increased pain upon movment in his neck and left upper extremity tingling (Ex. 3F/1/7). Upon examination, the claimant was in moderate distress (Ex. 3F/9). The claimant had tenderness to palpation in his left paraspinal from the base of his skull extending into his lateral neck and bilaterally into his trapezius (Ex. 3F/9). However, there were no noted motor or sensory deficits (Ex. 3F/9). Furthermore, a cervical x-ray revealed only relatively mild early denerative disc disease at C5-6 with satisfactory anterior cervical spine fusion hardware positioning (Ex. 3F/l0). The claimant was discharged the same day with instructions to ice/heat the affected area and follow up with nuerology if his symptoms worsened (Ex. 3F/9). The medical evidence does not support that the claimant's symptoms worsened and he was seen by a nuerologist.

Rather, continued appointments with Dr. Moorad in February and May 2014 revealed the claimant had tenderness in the cervical area and the cervical spine with decreased range of motion, limited flexibility, and decreased posture (Ex. 5F/2/7-8). Moreover, Dr. Moorad found the claimant had tenderness over the paravertebral muscles and spine bilaterally; and decreased flexion, range of motion, and flexibility (Ex. 5F/2/7-8). However, even with the above findings, at these same appointments, the

claimant had no muscle spasms, no muscle atrophy, negative straight leg raises, and normal strength in all of his extremities (Ex. 5F/2/7-8). Dr. Moorad also found that the claimant had good motor and muscle strength with intact sensation (Ex. 5F/2/7-8). *Moreover, again, Dr. Moorad found the claimant was able to do more functionally with the help of his medications (Ex. 5F/1/6). Lastly, Dr. Moorad noted the claimant continued to work as a bus driver* (Ex. 5F/1/6).

The undersigned notes that at both the February 2013 and February 2014 appointments, Dr. Moorad noted that the claimant was experiencing a "flare up" of his pain (Ex. 1F/3/10; 5F/8). However, the claimant also admitted that at this time, he had decreased his medications (Ex. 1F/2/3; 5F/6). It is unclear if Dr. Moorad decreased the claimant's medication or if the claimant made this decision independently. Regardless, Dr. Moorad found that even with the "flare ups" the claimant was more functional on his medications and could do more of his daily activities (Ex. 1F/2/8; 5F/6). Furthermore, Dr. Moorad noted that although increased activity made his pain worse, the claimant was able to do more and is more functional with the help of his medications (Ex. 1F/2/8; 5F/6). Thus, the undersigned finds that the even though the claimant experiences pain, it is not limiting to the extent alleged.

AR 20-21 (second, third, fourth, and fifth emphases added).

**B.    The ALJ's assessment of Dr. Moorad's treating physician opinions.**

The ALJ also discussed the opinion evidence of record, starting with

the opinions provided by Dr. Moorad:

As for the opinion evidence, on June 28, 2014, the claimant's treating physician, Dr. Moorad, opined the claimant cannot stand and/or walk for six hours out of an eight-hour day (Ex. 4F/1). Rather, Dr. Moorad opined the claimant can walk for two to three hours (Ex. 4F/1). Dr. Moorad opined the claimant would need three to four one hour unscheduled breaks per workday (Ex.

4F/1).  Lastly, Dr. Moorad opined the claimant would be absent more than four days per month (Ex. 4F/1).  *The undersigned gives no weight to Dr. Moorad's opinion as the course of treatment pursued by Dr. Moorad has not been consistent with what one would expect if the claimant were truly disabled, as Dr. Moorad has opined.*  Although Dr. Moorad found tenderness to palpation and a decreased range of motion in the claimant's cervical spine, he also found that there were no muscle spasms, no motor deficits, and normal muscle strength (Ex. 1F; 5F).  Furthermore, Dr. Moorad repeatedly prescribed the same prescription medications (Ex. 1F; 5F).  In fact, at times, Dr. Moorad noted that the claimant is able to do more functionally with the help of his medications (Ex. 1F/2/9/10/14/15).  In addition, Dr. Moorad recommended the claimant perform stretching and walking exercises (Ex. 1F; 5F).  The undersigned also gives no weight to Dr. Moorad's opinion because it is in contrast to the State agency medical consultant's opinions to which the undersigned accorded great weight.  Lastly, the claimant's ability to work part-time as a school bus driver does little to support Dr. Moorad's opinion.  *Therefore, the undersigned gives his opinion no weight.*

*Id.* at 23 (emphases added).  The ALJ then explained why he had "accorded great weight" to the State agency medical consultant's opinions:

At the initial level on August 8, 2013, State agency medical consultant, Herbert Meites, M.D., opined the claimant can perform work at the light exertional level (Ex. 3A/5-6; 4A/5-6).  Furthermore, at the reconsideration level on October 25, 2013, State agency medical consultant, LMW, M.D., opined to the same limtiations as Dr. Meites . . . .  The undersigned gives these opinions great weight as the medical evidence and the claimant's activities of daily living support them.

As to Dr. Meites' and Dr. LMW's opinions, the limiting effects of the claimant's impairments are not as limiting as alleged.  The claimant has no muscle spasms, no muscle atrophy, negative straight leg raises, and normal strength in all of his extremities (Ex. 5F/2/7-8).  Moreover, even when the claimant has a "flare up" of pain from his degenerative disc disease, his treatment

provider notes that the claimant was functional on his medications and could perform his daily activities (Ex. 1F/2/8; 5F/6). However, the undersigned included additional postural limtitations due to the claimant's prior back surgery and Dr. Moorad's findings of decreased range of motion.

In addition to the objective medical findings, the claimant's activities of daily living support the State agency opinions that the claimant can perform work at the light exertional level. Specifically, the claimant's ability to do light household chores, ride the lawnmower, and drive a school bus support their opinions . . . . *Thus, the undersigned gives the State agency consultants' opinions great weight.*

*Id.* (emphasis added).

## C. Evaluation of treating physician opinions.

"[Tenth Circuit] case law, the applicable regulations, and the Commissioner's pertinent Social Security Ruling (SSR) all make clear that in evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). At the first step, the ALJ must determine if the opinion "is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* "If the opinion is deficient in either of these respects, it is not to be given controlling weight." *Id.* If the ALJ finds the opinion is not entitled to controlling weight, he must proceed to the second step of the inquiry and

"make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Id.*

> Relevant factors may include:
>
> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal quotation marks omitted). So long as the ALJ provides a well-reasoned discussion, his failure to "explicitly discuss" all the factors "does not prevent [the] court from according his decision meaningful review." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). When rejecting, as here, a treating physician's opinion, the ALJ must provide specific, legitimate reasons. *See Drapeau v. Massanari*, 255 F.3d 1211, 1213-14 (10th Cir. 2001).

### D.    Specific contentions.

Plaintiff maintains that "even if some of them are sufficiently specific, the ALJ's reasons for according 'no weight' (i.e. rejecting) Dr. Moorad's

opinions were not legitimate, failed to adequately evaluate the opinions with respect to the relevant regulatory factors, and did not demonstrate that the opinions were given any deference as required by law." Doc. 15, at 9-10 (citations omitted).

### 1. Whether the ALJ provided legitimate reasons.

The ALJ gave three reasons for his rejection of Dr. Moorad's opinion that Plaintiff suffers from disabling limitations:

(1) the opinion is at odds with Dr. Moorad's course of treatment;

(2) the opinion "is in contrast to the State agency medical consultant's opinions to which [he] accorded great weight"; and

(3) Plaintiff's "ability to work part-time as a school bus driver does little to support Dr. Moorad's opinion."

AR 23.

### a. Course of treatment.

The ALJ concluded, "Dr. Moorad has opined" that Plaintiff is "disabled." AR 23. Plaintiff does not contest that conclusion. *See* Doc. 15. Nor can he, given Dr. Moorad's stated opinions that Plaintiff is only able—with frequent breaks—to stand/walk for two to three hours in an eight-hour day; needs at least three to four unscheduled one-hour breaks every workday; and will be absent from work more than four days per month. AR 512, 23. Considering these disabling restrictions imposed by Dr. Moorad alongside the

doctor's records of Plaintiff's treatment, the ALJ observed that although Dr. Moorad documented tenderness to palpation and a decreased range of motion in Plaintiff's cervical spine, he also found Plaintiff had normal muscle strength and no muscle spasms or deficits. *Id.* at 23. The ALJ also found that Dr. Moorad consistently prescribed the same medications for Plaintiff and had "noted that [Plaintiff] is able to do more functionally with the help of his medications . . . ." *Id.* And, the ALJ found Dr. Moorad had prescribed walking and stretching exercises for Plaintiff. *Id.*

In arguing these were not "legitimate" reasons for the ALJ to reject Dr. Moorad's opinions, Plaintiff contends the ALJ "took issue" with Dr. Moorad's course of treatment and argues "such criticisms" are impermissibly grounded only in the "ALJ's own lay medical judgment." Doc. 15, at 10. Plaintiff misperceives the ALJ's finding. The ALJ did not fault Dr. Moorad's course of treatment but, rather, found "the course of treatment pursued by Dr. Moorad has not been consistent with what one would expect if the claimant were truly disabled . . . ." AR 23; *see DeFalco–Miller v. Colvin*, 520 F. App'x 741, 746 (10th Cir. 2013) (no error in giving little weight to treating physician opinion where the physician's course of treatment "belied [his] opined

12

limitations"). Plaintiff fails to show this was not a legitimate reason for the

ALJ to reject Dr. Moorad's *disabling* limitations.[3]

### b. State agency expert's opinions.

The second reason the ALJ rejected Dr. Moorad's opinion evidence was

"because it is in contrast to the State agency medical consultant's opinions to

which the undersigned accorded great weight." AR 23. Plaintiff does not

challenge the evidentiary basis for the State experts' opinions—described in

detail by the ALJ—but, instead, maintains "the ALJ's decision to reject Dr.

Moorad's opinions . . . . conflict[s] with the principle that opinions of

examining sources are generally entitled to more weight than those of non-

examining sources . . . ." Doc. 15, at 12 (citing 20 C.F.R. §§ 404.1527(c)(1),

416.927(c)(1)).[4] And, he contends, "using the state agency physicians'

findings as a frame of reference for evaluating Dr. Moorad's opinions was

approaching the analysis in reverse." *Id.* Plaintiff relies on *Hamlin v.*

---

[3]     Plaintiff—who is well-counseled—cites *Watkins*, 350 F. 3d at 1300, and
states his claim for judicial review is that "[t]he ALJ erred, as a matter of
law, by failing to properly evaluate the opinions of [Plaintiff's] treating pain
management specialist, Dr. Moorad." Doc. 15, at 7; *see* AR 512. Then, by
listing the restrictions set out in Dr. Moorad's Medical Source Statement,
Doc. 15, at 8-9, he specifies "the opinions" he contends the ALJ "fail[ed] to
properly evaluate" in this case, *id.* at 7, and the court confines its review to
the ALJ's assessment of those opinions.

[4]     Notably, Plaintiff does not claim an ALJ can *never* accord greater
weight to a non-examiner's opinion than he does to an opinion provided by an
examining, treating physician.

*Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (internal citations omitted) ("When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physicians report, not the other way around.").

The ALJ precisely followed *Hamlin*'s directive. He explained the weight he was giving to the opinions of the state agency medical consultants and why he was doing so and he gave his rationale for giving no weight to Dr. Moorad's opinions. AR 23. "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it [and h]e must also give good reasons in his written decision for the weight he gave to the treating physician's opinion." *Hamlin*, 365 F.3d at 1215 (internal citation omitted). Plaintiff fails to demonstrate legal error.

### c. Plaintiff's ability to work part-time as a school bus driver.

The third reason the ALJ rejected Dr. Moorad's opinions was that "[Plaintiff's] ability to work part-time as a school bus driver does little to support Dr. Moorad's opinion." AR 23. Plaintiff maintains this "effectively punish[es Plaintiff] for his willingness to continue working to the extent possible, but it also fail[s] to explain how the limited number of hours he worked at that job were in any way equivalent to performing light work on a full time basis." Doc. 15, at 12.

14

Plaintiff fails to demonstrate this reason is not legitimate. As the ALJ noted, Plaintiff testified he works part-time as a school bus driver. AR 22. The ALJ further noted "in September 2013, [Plaintiff's] employer reported that [Plaintiff] completes all of his job duties without special assistance . . . ." *Id.* The fact that Plaintiff has been able to hold a job as a school bus driver – whether full-time or part-time – when, in Dr. Moorad's opinion, he has to take *unscheduled* one-hour breaks every work day and has to be absent more than four days per month, *id.* at 512, does indeed "do[] little to support Dr. Moorad's opinion." *Id.* at 23.

> **2.** **Whether the ALJ's decision demonstrates that he properly evaluated Dr. Moorad's opinions with respect to the regulatory factors and gave those opinions the deference required by law.**

Plaintiff also challenges the legal sufficiency of the ALJ's rejection of Dr. Moorad's disabling limitations by arguing the ALJ failed to explicitly comment on "the length and frequency of Dr. Moorad's treating (and examining) relationship with [Plaintiff ]or about Dr. Moorad's significant credentials despite both factors also supporting the latter's opinion." Doc. 15, at 13. Plaintiff also contends "the ALJ's analysis of Dr. Moorad's opinions was legally insufficient because it failed to demonstrate that the opinions were given any degree of deference as required by law." *Id.* at 14.

The ALJ demonstrably recognized Dr. Moorad's status as Plaintiff's treating physician. AR 23. Additionally, he reviewed – by date – Dr. Moorad's treatment notes, *id*. at 20-23, and, from that, the court can reasonably presume his awareness and consideration of the frequency of treatment. Given that Dr. Moorad's signature block details his credentials, the same holds true. *See* AR 358-402, 513-32. And, once again, so long as the ALJ provides a well-reasoned discussion, his failure to "explicitly discuss" all the factors "does not prevent [the] court from according his decision meaningful review." *Oldham*, 509 F.3d at 1258. As to deference, the ALJ states he "considered [the] opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." AR 18. Plaintiff does not state any "reason to depart from" the "general practice . . . [of] tak[ing] a lower tribunal at its word when it declares that it has considered a matter." *Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005).

## VI. Conclusion.

The court AFFIRMS the Commissioner's decision.

ENTERED this 13th day of September, 2016.

_____
SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE